**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LOUIS PISTOLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:19-CV-1182-MAB** |
| | ) | |
| **J.F. ELECTRIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| **LOUIS PISTOLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:19-CV-1185-MAB** |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **AMEREN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

Plaintiff Louis Pistolis brought two cases, 19-cv-1182 and 19-cv-1185, against

Defendants J.F. Electric and Ameren, respectively, alleging he was discriminated and

retaliated against in violation of the Americans with Disabilities Act ("ADA") while

working as a foreman for J.F. Electric on an Ameren worksite (Doc. 2; 19-cv-1185, Doc.

2).[1] *See generally* 42 U.S.C. § 12101 *et seq.* Pistolis's cases were consolidated on July 9, 2020

---

[1] Docket citations are to the docket in 19-cv-1182 unless otherwise specified. Additionally, when citing to the transcript, the Court will first cite the CM/ECF page and then specifically state which transcript page is being referenced.

(Doc. 41; *see also* 19-cv-1185, Doc. 42). This matter is currently before the Court on Defendants' motions for summary judgment (Docs. 138, 140). For the reasons set forth below, Defendant J.F. Electric's motion is DENIED and Defendant Ameren's motion is GRANTED.

<u>BACKGROUND</u>

Pistolis worked for Defendant J.F. Electric beginning in the mid-1990s (Doc. 148, p. 1; Doc. 51, p. 2; Doc. 141, p. 3; Doc. 141-1 at transcript p. 27:1-4). He would obtain work with J.F. Electric by signing up for discrete projects through his Union Hall, IBEW Local 309 (Doc. 148, p. 1; Doc. 141-1 at transcript p. 27:5-7). In 2002, Pistolis was diagnosed with post-traumatic stress disorder ("PTSD") based upon events that occurred during his time in the military (Doc. 51, pp. 33-34; Doc. 139-2 at transcript p. 26). Prior to the key events in this case, J.F. Electric was aware of Pistolis's status as a disabled veteran who suffers from PTSD (Doc. 51, p. 2; Doc. 141, p. 2; Doc. 149-3, p. 24 at transcript pp. 10-11; Doc. 149-4, p. 4).

In October 2018, Pistolis was assigned by J.F. Electric to perform work at an Ameren substation in Cahokia, Illinois (Doc. 148, p. 2; Doc. 51, p. 7; Doc. 141-1 at transcript p. 80:7-16). On October 9, 2018, Pistolis was involved in a safety-related incident at the Ameren worksite that resulted in an investigation into whether he committed a Worker's Protection Assurance Violation ("WPA violation") (Doc. 148, pp. 2-3; Doc. 51, p. 7; Doc. 141, p. 2). On October 12, 2018, Pistolis was informed by two supervisors at J.F. Electric, Kevin Settle and Rob Zbinden, that he was temporarily banned from Ameren properties while the potential WPA violation was investigated (Doc. 148,

p. 3; Doc. 51, p. 7; Doc. 149-3, p. 43 at transcript pp. 16-17). During the investigation conducted by J. F. Electric, Pistolis continued to work for J.F. Electric at other sites, although he found the other assignments were less desirable (Doc. 148, p. 5; Doc. 51, p. 8; Doc. 139, p. 6; Doc. 149-4, p. 23 at transcript p. 102; Doc. 149-1, p. 30). J.F. Electric continued to pay him his normal pay during this period (Doc. 148, p. 5; Doc. 139-1, pp. 10-11 at transcript pp. 68-69). Pistolis turned down one assignment from J.F. Electric during this period because it was three hours away and involved going on a high line, which he informed Kevin Settle he could not do because he was experiencing severe wrist pain (Doc. 141-1, pp. 26-27 at transcript pp. 121-122). Pistolis also complained to his supervisors at J.F. Electric that his WPA violation investigation was being handled differently than others and that he felt he was being singled out (Doc. 149-3, p. 25 at transcript p. 15).

At 1:20 a.m. on November 21, 2018, Pistolis sent an email titled "Judgment Day" to various employees at J.F. Electric and Ameren (Doc. 148, pp. 5-6; Doc. 149-4, p. 9; Doc. 141-1, p. 30 at transcript p. 132; Doc. 141, p. 5; Doc. 147, p. 18). In that email, Pistolis stated:

> So today is the big judgment day for Lou Pistolis. First of all I want to thank JF electric, who I have been working for on and off since 1994, for taking care of me through this very hard time of Ameren defaming and lying about my conversations with dispatch. … I am Lou Pistolis, I will not ever bow down to anyone who sits in an office and wants to cast judgment upon me and my brothers. … [W]ho are you to defame slander 30 years of hard work to build your system! … I really don't give a shit about your stupid judgment. Any normal person can see that you are lying and trying to protect a bad switching order. Honestly, being a disable[d] veteran who suffers from severe PTSD, I don't know if I can work on Ameren property again. … I would never WILFULLY ignore WPA orders. I have been an advocate for safety from day one. I have fired brothers for safety violations. LET HE WHO IS WITHOUT SIN CAST THE FIRST STONE!!!

(Doc. 149-4, p. 9). His email also included the middle finger emoji (Doc. 148, p. 6).

Several hours after sending his email, Robert Zbinden, a general foreman at J.F. Electric, allegedly called Pistolis to either offer or inform him of a job at Alton Steel (Doc. 149-4, pp. 4 & 12; Doc. 149-3, p. 27 at transcript p. 24). However, later that day, Pistolis was laid off from his employment with J.F. Electric, reportedly due to a reduction in force (Doc. 148, p. 7; Doc. 51, p. 19).

Meanwhile, J.F. Electric concluded its investigation and determined that Pistolis committed a WPA violation, but it was not willful (Doc. 141, p. 6; Doc. 139-1, p. 13 at transcript p. 71; Doc. 149-3, p. 35 at transcript p. 55). Additionally, on or around December 3, 2018, Pistolis met with Ameren officials to discuss his ban from Ameren worksites (Doc. 138, p. 3). After asking Pistolis "where [his] head was at," Ameren permitted him to work for a contractor on Ameren's properties again (Doc. 149-1 at p. 15).

Pistolis filed a suit against each Defendant in October 2019 (Doc. 2; *see also* 19-cv-1185, Doc. 2). Defendants both moved to dismiss Pistolis's claims in January 2020 (Doc. 25; 19-cv-1185, Doc. 27). On July 9, 2020, the Court denied Defendants' motions to dismiss Pistolis's discrimination claims and granted their motions to dismiss his retaliation claims because Pistolis failed to specify who he was raising retaliation claims against and for what actions (Doc. 41). However, the Court's Order permitted Pistolis to file an amended complaint to clarify his retaliation claims (*Id.* at p. 10). On September 25, 2020, Pistolis filed his Second Amended Complaints against Defendants (Doc. 51; *see also* 19-cv-1185, Doc. 50). In his amended complaint against J.F. Electric, Pistolis clarified that his

retaliation claims against J.F. Electric concerned its alleged retaliation against him due to his PTSD and wrist injuries (Doc. 51 at pp. 3-4). Meanwhile, in his amended complaint against Ameren, Pistolis specified that he was bringing a retaliation claim against Ameren for retaliating against him in relation to his PTSD (19-cv-1185, Doc. 50 at p. 4). Defendants filed the instant motions for summary judgment after the close of discovery (Docs. 138, 140).

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). The non-movant receives the benefit of conflicting evidence and reasonable inferences but is still required to produce evidence sufficient to establish the essential elements of his or her claims. *Jackson v. Sheriff of Winnebago County, Illinois*, 74 F.4th 496, 500 (7th Cir. 2023). In other words, if the nonmovant presents enough evidence such that a reasonable jury could return a verdict in his or her favor, summary judgment is inappropriate. *Id.*

Additionally, in light of Pistolis's *pro se* status, the Court liberally construes his factual allegations and pleadings. *See Smallwood v. Williams*, 59 F.4th 306, 318 (7th Cir. 2023). Moreover, the Court may consider any evidence placed in the summary-judgment record to help fill in any gaps. *See Arroyo v. Volvo Group N.A., LLC*, 805 F.3d 278, 285 (7th Cir. 2015) ("Arroyo did include the emails and other materials in the record, so we are free to consider them."). However, "a lawsuit is not a game of hunt the peanut.

Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes....'" *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1993)). Consequently, in instances where the nonmovant does not cite to evidentiary support, the Court is not inclined to conduct its own research to determine whether his claims are substantiated. *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013) (Explaining that "the plaintiff's factual statements will be entertained only to the extent that they are supported by the record[.]").

<u>ANALYSIS</u>

I.    ***J.F. Electric's Motion for Summary Judgment (Doc. 140)***

     a.    <u>*Pistolis's Discrimination Claims Against J.F. Electric*</u>

J.F. Electric argues it is entitled to judgment as a matter of law on Pistolis's ADA discrimination claim because Pistolis has not provided any evidence that his layoff was related to an asserted disability (Doc. 141 at pp. 9-10). J.F. Electric further contends that the evidence presented by Pistolis demonstrates that J.F. Electric attempted to find additional work for him before being forced to terminate his employment due to a lack of work (*Id.* at pp. 10-14). Finally, J.F. Electric claims Pistolis failed to meet his burden of demonstrating that J.F. Electric's proffered reason for his termination was pretextual.

The ADA prohibits employers from discriminating against employees "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a violation of section 12112(a), Pistolis is required to show that "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016); *see also Kurtzhals v. County of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020) (applying the same test but splitting the third prong into two separate prongs, with the one prong examining whether the plaintiff suffered an adverse employment action and the other prong examining whether the adverse action was caused by his disability). Significantly, "[t]o establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action, in this case termination." *Monroe v. Indiana Dept. of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017).

Additionally, even if Pistolis establishes a prima facie case of discrimination, J.F. Electric can avoid liability by presenting evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). If J.F. Electric makes such a showing, the burden shifts back to Pistolis to present evidence that J.F. Electric's stated reason was pretextual. *Id.* "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (internal quotation marks and citation omitted).

J.F. Electric concedes that Pistolis's PTSD qualifies as a disability within the

meaning of the ADA (Doc. 141 at p. 9). *See also Kurtzhals*, 969 F.3d at 728 (finding PTSD symptoms could qualify as a disability if proven to be true). Likewise, J.F. Electric does not dispute that Pistolis was qualified to perform the essential functions of his job (Doc. 141 at p. 10). Furthermore, J.F. Electric does not dispute that Pistolis's termination was an adverse employment action (*see generally* Doc. 141). *See also Brooks*, 39 F.4th at 434 ("Under the third step, there is no dispute that Brooks' termination qualified as an adverse employment action.")

Therefore, the first question is whether Pistolis provided evidence which could establish that his disability or disabilities were the "but for" cause of J.F. Electric's decision to terminate his employment. *Kurtzhals*, 969 F.3d at 729 ("In other words, could a reasonable juror conclude that he would not have suffered the same adverse employment action if he were not disabled and everything else had remained the same?"). Additionally, because "[t]he prima facie case and pretext inquiries often overlap; we may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman-Reyes v. St. Xavier U.*, 500 F.3d 662, 665 (7th Cir. 2007).

J.F. Electric cited a lack of available work as a nondiscriminatory explanation for its termination of Pistolis (Doc. 141 at p. 17). If true, lack of available work is a legitimate, nondiscriminatory reason for an adverse employment action. *See Lubeck v. Comet Die and Engraving Co.*, 848 F. Supp. 783, 789 (N.D. Ill. 1994). Consequently, to survive J.F. Electric's motion for summary judgment, Pistolis must to show that J.F. Electric's proffered reason

for his layoff was pretextual and his disability was the actual "but for" cause of his termination.

The evidence currently before the Court convinces the Court that Pistolis has carried his burden in this regard. First and foremost, Pistolis has provided evidence to create a triable issue as to whether J.F. Electric had other work available for him at a non-Ameren worksite on the day of his termination (Doc. 149-4, pp. 4 & 12-13; Doc. 149-3, p. 27 at transcript p. 24). *See also Monroe*, 871 F.3d at 504 (holding that a plaintiff may rely on circumstantial evidence such as suspicious timing, evidence that similarly situated employees outside the protect group receive better treatment, and evidence that the employer's stated reason was pretextual). Indeed, Pistolis was either offered or informed of other available work at Alton Steel just hours before his termination (Doc. 149-4, pp. 4 & 12; Doc. 149-3, p. 27 at transcript p. 24). This evidence could certainly be used to demonstrate that J.F. Electric's stated reason for terminating his employment was pretextual. *See U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (Explaining that summary judgment is only proper "where no rational fact finder could believe that the employer lied about its proffered reasons for the hiring decision in question."). Pistolis also presented some evidence that J.F. Electric replaced him with a younger, less-qualified individual who did not suffer from a disability (Doc. 149-3, p. 9 at transcript p. 32; Doc. 149-3, p. 28 at transcript p. 27).

Furthermore, Pistolis provided circumstantial evidence related to the suspicious timing of his firing following his complaints and "Judgment Day" email after he was allegedly informed of a new job opportunity with J.F. Electric (Doc. 148, pp. 5-6; Doc. 149-

4, p. 9). If true, this circumstantial evidence provides additional support for Pistolis's claim that his termination was due to his disability and not a lack of work. Likewise, Pistolis has referenced evidence that could establish that J.F. Electric employees who did not suffer from a disability were not subject to the same prolonged review process of an alleged safety violation (Doc. 149-2, pp. 4-8 & 14-48; Doc. 149-3, pp. 28-29 at transcript pp. 29-30; Doc. 149-4, p. 3).[2]

In conclusion, Pistolis has provided sufficient evidence to create a triable issue of fact as to whether J.F. Electric took adverse employment actions against him because of his disability and not for the reason given by J.F. Electric. Consequently, J.F. Electric's motion for summary judgment as to Pistolis's ADA discrimination claim is DENIED.

   b.   _Pistolis's Retaliation Claims Against J.F. Electric_

J.F. Electric argues it is entitled to judgment as a matter of law on Pistolis's ADA retaliation claim because he failed to establish that he engaged in a protected activity (Doc. 141 at p. 15). J.F. Electric emphasizes that Pistolis's "Judgment Day" email did not raise a complaint about disability discrimination (_Id._ at pp. 15-16). Moreover, J.F. Electric contends that Pistolis cannot bring an ADA retaliation claim against it because he has failed to satisfy his burden of demonstrating that J.F. Electric's stated reason for his termination was mere pretext (_Id._ at pp. 16-19).

The ADA prohibits employers from retaliating against employees who assert their

---

[2] However, in at least one of the situations Pistolis references, the employee was not found to have committed a safety violation (Doc. 149-3, p. 35 at transcript p. 55). Nonetheless, this evidence could still support Pistolis's claims of discrimination because he is also arguing that the safety violation review process he was subjected to was considerably different than what other J.F. Electric employees faced.

right to be free from discrimination. 42 U.S.C. § 12203(a). As the Seventh Circuit explained

in *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*:

> To establish a case of retaliation under the direct method of proof, a plaintiff must show (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two. Plaintiffs can also elect to use the indirect, burden-shifting method for retaliation claims, under which the plaintiff must demonstrate that he (1) engaged in protected activity; (2) was performing his job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual.

657 F.3d 595, 601-02 (7th Cir. 2011) (internal citations omitted).

The Court has already addressed aspects of Pistolis's retaliation claim in its analysis of Pistolis's discrimination claim against J.F. Electric. To reiterate, Pistolis met his burden of demonstrating that the reason J.F. Electric provided for his termination might have been pretextual. Additionally, J.F. Electric does not dispute that Pistolis performed his job satisfactorily and that he suffered an adverse employment action.

Notably, Pistolis provided evidence that he engaged in statutorily protected activity on several occasions prior to his termination. Pistolis provided testimony from supervisors at J.F. Electric that he complained to them about being treated differently than other employees based upon his PTSD (Doc 149-4, p. 4; Doc. 149-3, p. 25 at transcript p. 15; Doc. 149-3, p. 12 at transcript p. 43). In fact, Pistolis allegedly even threatened a lawsuit against Ameren based upon the lengthy WPA

violation review process (Doc. 149-3, p. 12 at transcript p. 42).[3] Additionally, Pistolis alleges that his "Judgment Day" email constituted a protected activity under the ADA because it reminded J.F. Electric of his disability and opposed his disparate treatment (Doc. 147 at p. 13). Informal complaints to supervisors can constitute protected activity for purposes of a retaliation claim. *See Davis v. Time Warner Cable of S.E. Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011); *Altheimer-Umphlett v. DeJoy*, 2023 WL 4365993, at *12 (N.D. Ill. July 6, 2023); *Kruger v. Principi*, 420 F.Supp.2d 896, 910 (N.D. Ill. 2006). Moreover, it does not matter whether his complaints about Defendants' disparate treatment of his alleged safety violation were justified, all that is required to establish protected activity is that Pistolis sincerely and reasonably believed he was complaining about conduct prohibited under the ADA. *See Castro v. DeVry U., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

Furthermore, whether Pistolis's "Judgment Day" email constitutes a protected activity is a close call and this type of a close call is best left for the jury. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). In contrast, Pistolis's email both invoked his status as a disabled veteran who suffers from PTSD and complained of his disparate treatment (Doc.

---

[3] J.F. Electric correctly points out that Pistolis also needed to demonstrate that J.F. Electric was aware of his protected conduct prior to its adverse actions (Doc. 141 at p. 15). *See Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1156 (7th Cir. 2021). However, it is reasonable to infer that J.F. Electric was aware because the informal complaints referenced by Pistolis were made to supervisors at J.F. Electric.

149-4, p. 9). *See Xiong v. Board of Regents of University of Wisconsin System*, 62 F.4th 350, 355 (7th Cir. 2023) (employee engaged in protected activity by stating to vice chancellor that his supervisor had said that "people of color are not a good fit" for human resources and that he had concerns about the human resources department's hiring and promotion practices).

Therefore, the remaining question is whether Pistolis offered sufficient evidence to create a genuine issue of material fact as to whether his complaints caused his termination. *Castro*, 786 F.3d at 564. As discussed above, circumstantial evidence such as suspicious timing, disparate treatment, and evidence of a pretextual explanation, may suffice if it would permit a reasonable trier of fact to infer retaliation by the employer. *Id* at 564-65. Here, Pistolis's complaints were made within close temporal proximity to the date of his termination. In fact, he was terminated the same day he sent his "Judgment Day" email (Doc. 148, p. 7). Even if the timing of Pistolis's complaints alone is insufficient to raise a triable claim of retaliation, as previously discussed, Pistolis also provided evidence of disparate treatment and a pretextual explanation. *See generally Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020) ("[C]lose timing alone is rarely enough to raise a triable claim of retaliation."). Specifically, Pistolis provided evidence that he was offered or informed of other available work just hours before his termination which was premised upon a lack of available work (Doc. 149-4, pp. 4 & 12; Doc. 149-3, p. 27 at transcript p. 24). Accordingly, based on the evidence presented, a triable issue of fact exists as to whether J.F. Electric retaliated against

Pistolis because of his informal complaints. Consequently, J.F. Electric's motion for summary judgment as to Pistolis's ADA retaliation claim is DENIED.

## II.      Ameren's Motion for Summary Judgment (Doc. 138)

Ameren argues it is entitled to summary judgment for several reasons (Docs. 138, 139). First, Ameren argues Pistolis failed to establish that he was employed by Ameren, such that liability can be imposed against it (Doc. 139 a pp. 9-14). Second, Ameren argues Pistolis failed to establish a viable discrimination claim against it because Ameren did not take any adverse employment action against him and he has failed to establish that Ameren's proffered explanation for its action was pretextual (*Id.* at p. 15). Ultimately, because Pistolis has not established that Ameren was either his direct employer or a joint employer, Ameren's motion for summary judgment will be granted and the Court need not reach the remainder of Ameren's arguments (Docs. 138, 139).

As a threshold matter, in order to assert his rights as an employee under the ADA, Pistolis must establish that he was "employed by" the defendant (*i.e.,* Ameren) he seeks to hold liable. *See* 42 U.S.C. § 12111(4); *Whitaker v. Milwaukee County, Wisconsin*, 772 F.3d 802, 809 (7th Cir. 2014). Typically, a plaintiff establishes this by proving the existence of a direct employer-employee relationship. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). However, "[i]t is also well established in the Seventh Circuit that a plaintiff can, under certain limited circumstances, bring a claim against a defendant who is not his direct employer" by demonstrating the defendant can be deemed an "indirect employer." *Id.* at 701-02. In determining whether an employer-employee relationship exists with an indirect employer, the Seventh Circuit has devised a test that requires a balancing of five

factors relevant to an employer-employee relationship:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Id.* at 702 (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

The Seventh Circuit's application of this test in *Love* is instructive. *See* 779 F.3d 697. In that case, the plaintiff was working for a subcontractor, which paid his salary, provided all benefits, and set his hours. *Id.* However, the plaintiff was permanently banned from the job site by the general contractor after being involved in a physical altercation with an employee of another subcontractor. *Id.* Pertinently, the general contractor reserved the right to investigate alleged misconduct by its subcontractors' employees and make the final decision as to the continued presence of any worker on the site. *Id.* at 700. The plaintiff ultimately brought suit against the general contractor for racial discrimination. *Id.*

On appeal, the main issue was whether the general contractor exercised sufficient control over the plaintiff, such that it could be considered his indirect employer under Title VII. *Id.* at 701. In analyzing the five *Knight* factors, the Seventh Circuit emphasized that the general contractor did not have the power to hire or fire the plaintiff, even if its ability to unilaterally remove him from the worksite essentially resulted in his termination because the subcontractor did not have other work available. *Id.* at 703-04. The court also noted that the subcontractor provided the plaintiff with training (except

for safety training on site, which was provided by the general contractor). *Id.* at 704. Nor did the general contractor provide the plaintiff with the bulk of his work materials, and the subcontractor provided all paychecks and benefits to the plaintiff. *Id.* at 704-05. And finally, the Seventh Circuit pointed out that the plaintiff anticipated working for the subcontractor, not the general contractor, after the project at issue was complete. *Id.* at 705. Ultimately, the Court found summary judgment to be appropriate because the plaintiff failed to demonstrate that the general contractor so far controlled his "employment relationship" that it was appropriate to regard it as his "de facto or indirect employer." *Id.* (quoting *E.E.O.C. v. State of Ill.*, 69 F.3d 167, 169 (7th Cir. 1995)).

Here, Pistolis has not provided any evidence demonstrating that he was a direct employee of Ameren (Doc. 139, p. 3).[4] Consequently, in order to hold Ameren liable under the ADA, Pistolis was required to demonstrate that Ameren acted as an indirect employer. Analyzing the *Knight* factors, the Court finds Pistolis has failed to do so.

The first *Knight* factor examines the extent to which the putative employer controls or supervises the actions of the alleged employee. *Love*, 779 F.3d at 702-03. Crucially, "when control is examined, 'the key powers are, naturally, those of hiring and firing.'" *Id.* at 703 (quoting *E.E.O.C.*, 69 F.3d at 171). Here, the record establishes that Ameren did ***not*** have the power to hire or fire Pistolis after his alleged safety violation (*see, e.g.*, Doc.

---

[4] The Court acknowledges that in Pistolis's response to Ameren's statement of undisputed material facts, he now contends Ameren "more or less owns J.F. Electric and that would make them my employer or a joint employer." (Doc. 151 at p. 2). However, the citations Pistolis provides in support do not assert this newly raised claim (*Id.*). Moreover, even though the Court was not required to do so, the Court has conducted an exhaustive review of the record and found no evidence in it to support Pistolis's claim that Ameren owns J.F. Electric.

150 at p. 15). Ameren's lack of control over Pistolis is further evinced by his concessions that he continued to work for J.F. Electric after his ban and that J.F. Electric terminated his employment, not Ameren (Doc. 150 at p. 19). Moreover, unlike in *Love*, Ameren's removal of Pistolis from its worksites was temporary and did not "essentially amount[] to a termination" of his employment with J.F. Electric. *Love*, 779 F.3d at 703.

Admittedly, the ability of a putative employer to control the "manner in which work is accomplished" is also an important consideration when analyzing a putative employer's control. *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996). Here, Pistolis has referenced some evidence that demonstrates Ameren took an active role in monitoring his work (Doc. 149-3, p. 29 at transcript pp. 30-31). However, that active role appears to have been primarily focused on ensuring safety compliance – not managing the details of how Pistolis performed his job (*see* Doc. 147, p. 1). Likewise, Pistolis admits that his primary supervisor in the field was J.F. Electric employee Rob Zbinden (Doc. 151, p. 7). Consequently, Ameren's ability to monitor Pistolis's safety compliance does not outweigh its clear lack of control over Pistolis in other critical regards, such as hiring and firing.

The second *Knight* factor does not support a finding of an indirect employer-employee relationship because Pistolis does not allege his skills were acquired while working at Ameren's worksite. To the contrary, Pistolis had developed substantial experience as a foreman long before the events giving rise to this case (Doc. 148, p. 1). And although Ameren required its contractor's employees to comply with safety rules and attend certain safety seminars, no other training was provided to Pistolis by Ameren.

As noted in *Love*, safety training alone is insufficient to weigh in favor of an employer-employee relationship. 779 F.3d at 704 ("This small amount of control is not what we had in mind in *Knight* when we articulated this factor.").

The third factor relates to the costs of operation, "such as equipment, supplies, fees, licenses, workplace, and maintenance of operations[.]" *Knight*, 950 F.2d at 378. The record does not contain substantial evidence on this point and Pistolis has not supported his claim with an appropriate citation to the record (*see* Doc. 150, p. 1). Pistolis has admitted that when laid off, he was required to return his truck, credit card, and phone to J.F. Electric (Doc. 147, p. 5). Additionally, even if Ameren provided a lot of the worksite materials, it would be an over-exaggeration to argue supplying job materials created an employer-employee relationship. *Love*, 779 F.3d at 704 n.3 ("However, to hold that [a general contractor's] actions of providing materials to EMI had the effect of creating an employer-employee relationship with [the plaintiff] would seem to over-exaggerate the significance of those actions as they relate to [the general contractor's] relationship with [the plaintiff].").

The fourth factor, which considers whether the putative employer was responsible for providing payment and benefits, also points away from the existence of an indirect employer-employee relationship. *Id.* Indisputably, Pistolis received his paychecks from J.F. Electric (Doc. 151, p. 2). *Love*, 779 F.3d at 704-05. J.F. Electric even continued to pay him while his WPA violation review was underway (Doc. 151, p. 8). Likewise, Pistolis received all benefits from J.F. Electric (Doc. 151, p. 2). Therefore, this factor weighs heavily in favor of finding that Ameren was not Pistolis's indirect employer.

Likewise, the fifth factor, which examines the length of an employee's job commitment and the parties' expectations, also weighs against finding Ameren to be Pistolis's indirect employer. *Love*, 779 F.3d at 705. Pistolis expected to, and did for a time, continue working for J.F. Electric. Pistolis does not allege that believed he would work for Ameren, as opposed to J.F. Electric, after the job's completion.

In conclusion, it is manifestly clear after considering the totality of the factors that there was *not* an indirect employer-employee relationship between Ameren and Pistolis. Ameren had no ability to hire or fire him, did not pay his salary or benefits, and was not who he expected to continue working for after the job's completion. Moreover, unlike in *Love*, it is noteworthy that Ameren allowed J.F. Electric to make the final determination as to whether Pistolis committed a safety violation. This deference was further evinced by Ameren's decision to permit Pistolis to return to its properties. In addition, Pistolis continued to work for J.F. Electric after his temporary ban from Ameren's worksites, further demonstrating the lack of control Ameren had over his employment. Put simply, Pistolis cannot demonstrate that Ameren "so far controlled the plaintiff's employment relationship that it was appropriate to regard [Ameren] as the de facto or indirect employer of the plaintiff[.]" *E.E.O.C.*, 69 F.3d at 169.

Finally, even if an indirect employer-employee relationship existed between Pistolis and Ameren, Pistolis's allegations center upon the delays in his safety investigation and his termination. Ameren was not responsible for either of those. Critically, after alerting J.F. Electric to the potential safety violation, it was J.F. Electric that conducted the investigation (Doc. 149-3, p. 44 at transcript pp. 18-19). Likewise, it

was J.F. Electric that terminated Pistolis's employment (Doc. 148, p. 7; Doc. 51, p. 19). Pertinently, "establishing a 'joint employer' relationship does not create liability in the co-employer for actions taken by the other employer." *Whitaker*, 772 F.3d at 811. Here, as in *Whitaker*, "nothing in the record suggests that [Ameren] participated in the alleged discriminatory conduct or failed to take corrective measures within its control." *Id.* at 812. In fact, prior to Pistolis's termination, Ameren apparently told J.F. Electric it was going to permit Pistolis to return to Ameren worksites (*see* Doc. 149-4 at p. 35).

For these reasons, the Court finds Ameren was not Pistolis's employer as required to establish a violation under the ADA. Therefore, Ameren's motion for summary judgment is GRANTED.

<u>CONCLUSION</u>

J.F. Electric's motion for summary judgment is **DENIED.** Ameren's motion for summary judgment is **GRANTED** and Ameren is **DISMISSED with prejudice** as a Defendant in this lawsuit. Judgement will be entered against Plaintiff Louis Pistolis and in favor of Ameren at the conclusion of this case.

This matter will proceed to trial on Pistolis's ADA discrimination and retaliation claims against J.F. Electric.

A status conference will be set by separate order at which time the Court intends to discuss the referral of this case for an additional settlement conference or mediation as well as trial scheduling.

**IT IS SO ORDERED.**

**DATED:  August 31, 2023**

<u>**s/ Mark A. Beatty**</u>
**MARK A. BEATTY**
**United States Magistrate Judge**